**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Seberaino Jimenez, | No. CV-15-01187-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Progressive Preferred Insurance Company, *et al.*, | |
| Defendants. | |

Plaintiff Seberaino Jimenez ("Jimenez"), who had an automobile insurance policy with Defendant Progressive Preferred Insurance Company ("Progressive") but no health insurance, was injured in a car accident in December 2013. After seeking medical treatment, which he claimed cost $6,719, Jimenez sought to recover from Progressive $5,000, the maximum allowable in medical benefits under his policy. Progressive determined that many of Jimenez's medical providers were part of a Voluntary Provider Network and had contractually agreed to accept reduced rates as payment in full. Based on the medical providers' agreement to accept reduced rates, Progressive sent Jimenez $3,455.09. Not satisfied with that amount, Jimenez filed this suit.

Jimenez sued on behalf of a class of persons, covered by auto insurance carriers, who were paid less than the policy limits due to Voluntary Provider Network contracts, alleging (1) breach of contract; (2) bad faith claims handling; (3) violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 *et seq.*; and (4) declaratory relief. Both Progressive and Jimenez have now filed motions for summary judgment. For the reasons

below, Progressive's motion will be granted and Jimenez's motion will be denied.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.[1] Jimenez was in a motor vehicle accident on December 25, 2013 (the "Accident"). (Doc. 218 at 1.) At the time of the Accident, Jimenez had an automobile insurance policy underwritten by Progressive ("Policy") with medical payments coverage ("Med Pay") of $5,000 per person, but did not have health insurance. (Doc. 218 at 2.) No one explained Med Pay coverage to Jimenez prior to him purchasing the Policy. (Doc. 218 at 2.) Jimenez never viewed Progressive's website, or any websites, to learn about Med Pay coverage prior to purchasing the Policy, nor did Jimenez rely on any advertisements about Med Pay prior to purchasing his Policy. (Doc. 213 at 2.) After the Accident, Jimenez sought medical treatment from four healthcare providers: (1) Arizona Injury Centers/Accident Chiropractic ("Arizona Injury Centers"), on December 27 and December 30, 2013; (2) SMI Imaging, on January 2, 2014; (3) Arizona Sports & Spine Physicians, P.C. ("Arizona Sports & Spine"), from January through March 2014, and (4) Strength Training Inc. Physical Therapy ("STI"), on February 17, 2014. (Doc. 213 at 9-11.)

There are several sets of contractual relationships at play. Jimenez has a contract with Progressive (the Policy). Progressive has entirely separate contracts with Voluntary Provider Networks ("VPN") of health providers.[2] These networks, in turn, have individual

---

[1] Jimenez submitted a document titled "Controverting Statement of Facts for Response" that did not comply with the requirements of Local Rule of Civil Procedure 56.1(b) in that Jimenez did not indicate whether he disputed each numbered paragraph of Progressive's separate statement of facts. (Doc. 220.) Instead, Jimenez submitted an 11-paragraph document that appears to be a statement of additional facts. (Doc. 220.) "Failure of the non-movant to comply with LRCiv 56.1(b) is ground for the Court to disregard a controverting statement of facts and deem as true the moving party's separate statement of facts in support of the motion for summary judgment." *Breeser v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150, 1153 (D. Ariz. 2013), *aff'd sub nom. Breeser v. Menta Grp., Inc.*, 622 F. App'x 649 (9th Cir. 2015); *see also Rosenberg v. Mabus*, No. 2:14-CV-01507 JWS, 2017 WL 2793907, at *2 (D. Ariz. June 28, 2017) ("Given [plaintiff's failure to properly address the [defendants'] assertions of fact, the court is largely unable to discern exactly which facts are disputed or exactly which specific materials support [plaintiff's] assertions. Where the court cannot so discern, the court invokes Rule 56(e)(2) and deems those facts undisputed."). Accordingly, Progressive's facts are deemed undisputed.

[2] Only Progressive's relationships with Coventry Health Care Workers Compensation, Inc. and with Three Rivers Provider Network are relevant here.

contracts with medical services providers (here, Arizona Injury Centers, STI, and Arizona Sports & Spine). Finally, Jimenez has signed liens with some of the medical services providers.

**A.     The Contracts**

*1.  The Policy*

The Medical Payments Coverage (Part II) of the Policy provided in relevant part:

**INSURING AGREEMENT**

If **you**[3] pay the premium for this coverage, **we**[4] will pay the reasonable expenses incurred for necessary **medical services**[5] received within three years from the date of a motor vehicle accident because of **bodily injury** … **We**, or someone on **our** behalf, will determine:
1.   whether the expenses for **medical services** are reasonable; and
2.   whether the **medical services** are necessary.

* * *

**UNREASONABLE AND UNNECESSARY EXPENSES**

If the **insured person** incurs expenses for **medical services** that **we** deem to be unreasonable and unnecessary, **we** may refuse to pay for those expenses and contest them.

* * *

The **insured person** may not sue **us** for expenses for **medical services we** deem to be unreasonable or unnecessary unless the **insured person** paid the entire disputed amount to the medical service provider or the medical service provider has initiated collection activity against the **insured person** for the unreasonable or unnecessary expenses.

(Doc. 213-1 at 14-17.)

The General Provisions (Part VII) of the Policy provided in relevant part:

---

[3] "'**You**' and '**your**' mean: (a) a person shown as named insured on the **declarations page**; and (b) the spouse of a named insured if residing in the same household." (Doc. 213-1 at 10.)
[4] "'**We**,' '**us**,' and '**our**' mean the underwriting company providing the insurance, as shown on the **declarations page**." (Doc. 213-1 at 9.)
[5] "'**Medical services**' means medical, surgical, dental, x-ray, ambulance, hospital, professional nursing, and funeral services, and includes the cost of eyeglasses, hearing aids, pharmaceuticals, orthopedics and prosthetic devices." (Doc. 213-1 at 15.)

- 3 -

**LEGAL ACTION AGAINST US**

**We** may not be sued unless there is full compliance with all the terms of this policy.

(Doc. 213-1 at 33, 37.)

On December 26, 2013, Progressive issued a Renewal Declarations Page to Jimenez when he renewed his insurance, which included a provision titled "Provider Network Program" that set forth information about "a network of medical providers … [that] may offer reduced rates … that could allow you to get more treatment if necessary," but noted in bold "**You are under no obligation to use any network referenced above. You're free to see a medical service provider of your choice.**" (Doc. 213 at 4, Doc. 213-1 at 52.)

*2.    The Voluntary Provider Network Contracts*

In 2009, Progressive entered into an agreement with Coventry Health Care Workers Compensation, Inc. ("Coventry") as part of a VPN. (Doc. 213 at 4.) That contract provided that Coventry had entered into "Provider Agreements" with "Contract Providers" such as "physician[s], hospital[s], and other providers of Medical Services," which required the Contract Providers to deliver medical services at specific contracted rates. (Doc. 213 at 4-5.) Coventry agreed to facilitate Progressive's access to the Contract Providers. (Doc. 213 at 4-5.)

In 2011, Progressive entered into an agreement with Three Rivers Provider Network ("Three Rivers") as part of a VPN. (Doc. 213 at 5.) That contract provided that Three Rivers had a "network of health care providers," such as "hospitals, ancillary health care facilities, and individual health care practitioners," called the "Participating Provider Network." (Doc. 213 at 5.) The Participating Providers contracted to "deliver health care services, including inpatient and outpatient medical services … at a reduced rate for [Three Rivers] clients" such as Progressive. (Doc. 213 at 5.) Three Rivers specifically represented that "its rates for the provision of services by each Participating Provider are the result of agreement with such Participating Provider" and "each and every Participating Provider has agreed … to accept the rates it has negotiated with [Three Rivers] as payment in full for the services rendered to a Claimant under an Auto Insurance Policy." (Doc. 213 at 6.)

- 4 -

In short, Coventry and Three Rivers do not have direct contracts with individual patients; patients receive the benefit of the contracts by being insured by Coventry's or Three Rivers' healthcare payer/insurer members (e.g. Progressive). (Doc. 213 at 6.)

### 3. *The Provider Contracts*

The contracts of three healthcare providers are also relevant. Arizona Injury Centers, Arizona Sports & Spine, and STI each had contracts with Coventry or Three Rivers at the time of the Accident. (Doc. 218 at 4.) Jimenez also signed documents with each of these providers at the time of his medical treatment.

#### i. Arizona Injury Centers

Arizona Injury Centers entered a contract with Three Rivers on October 29, 2007 ("Arizona Injury-Three Rivers Agreement"). (Doc. 213 at 8.) That agreement provided that Arizona Injury Centers would accept a certain percentage of the total billed charges as payment in full, and would not "balance bill the patient upon receipt of payment in full at the contracted rate." (Doc. 213 at 8-9, Doc. 213-3 at 9.)

Jimenez signed Arizona Injury Center's Notice of Doctor Lien on Personal Injury Proceeds ("Lien") and Financial Policy on December 27, 2013. (Doc. 220-1 at 2-3.) These documents provided that Jimenez was responsible for all bills incurred by him at Arizona Injury Centers and "grant[ed] Arizona Injury Centers[] an irrevocable lien on the proceeds of [his] legal case," and provided that Progressive, as Jimenez's "Med-Pay insurance carrier[]," would be "billed … to reduce current or outstanding balances prior to settlement negotiations." (Doc. 220-1 at 2-3.)

Progressive submitted a November 22, 2017 declaration by Dr. Keith Kujawski, the owner of Arizona Injury Centers, in which he declared, under penalty of perjury, that the Arizona Injury-Three Rivers Agreement applied "to all the treatment and services provided to Mr. Jimenez detailed above," that a "payment of $555.00 [wa]s payment in full for all of the treatment and services provided by [Arizona Injury Centers] to Mr. Jimenez on December 27 and December 30, 2013," and that Arizona Injury Centers "has not, and will never, seek payment of the difference between the amount originally billed ($785.00) and

the accepted, repriced contract rate ($555.00) from Mr. Jimenez or any person." (Doc. 213-3 at 1-3.)

Jimenez, through his attorney, submitted a second declaration of Dr. Kujawski, dated March 15, 2018, also under penalty of perjury. (Doc. 179-18.) The declaration stated Dr. Kujawski signed the first declaration "believing that Mr. Jimenez had a health contract with Three Rivers," the lien Jimenez signed "assert[ed] and protect[ed] [Arizona Injury Centers'] right to its full amount of billed charges from Seberaino Jimenez," and Arizona Injury Centers "expect[ed] to be paid the full amount of their billed charges .. *[by] Seberaino Jimenez.*" (Doc. 179-18 at 2) (emphasis added). This statement contradicts Dr. Kujawski's previous statement that Arizona Injury Centers would "never" seek additional payment from Jimenez. A few days after Dr. Kujawski signed this second declaration, on March 23, 2018, Jimenez sent Arizona Injury Centers a cashier's check for $785. (Doc. 174-13 at 38-40.)

ii. STI

STI, through Preferred Therapy Providers, Inc. ("Preferred"), entered a contract with First Health/Coventry on February 1, 2003 ("STI-Coventry Agreement"). (Doc. 213 at 7, Doc. 213-2 at 4.) The STI-Coventry Agreement provided, in the section titled "Payment In Full," that STI would accept "the reimbursement amounts specified in [the fee schedule] as payment in full" for medical services. (Doc. 213 at 8, Doc. 213-2 at 8.) STI's fee schedule for auto liability reimbursement pursuant to the STI-Coventry Agreement provided that each Preferred healthcare provider "shall be compensated the lesser of Provider's billed charges or [a specific percent][6] of the amount payable under that state['s] rules or guidelines. Any procedure code which is unvalued shall be reimbursed at [x]% of billed charges." (Doc. 213 at 8, Doc. 213-2 at 10.)

On February 17, 2014, Jimenez completed a registration form for STI. Under the heading "Financial Responsibility," Jimenez checked "Yes" in response to the question "Is there a party other than yourself or your health insurance that is responsible for the payment

---

[6] The precise contract terms are confidential. (Doc. 213-2 at 10.)

- 6 -

of these visits?"[7] (Doc. 220-1 at 4.) At the bottom of the first page of the registration form, the section titled "Assignment of Benefits/Financial Responsibility" provided Jimenez was "responsible for charges not covered or reimbursed by the above agents." (Doc. 220-1 at 4.)

### iii.     Arizona Sports & Spine

On February 1, 1997, Arizona Sports & Spine entered an "Affordable Health Care Concepts Participating Provider Agreement" with Coventry ("Arizona Sports-Coventry Agreement"). The Arizona Sports-Coventry Agreement provided in the section titled "Payment In Full," that Arizona Sports & Spine agreed to accept "the reimbursement amounts specified in [the fee schedule] as payment in full" for medical services. (Doc. 213 at 7.) The contract was signed by Dr. John Charochak, president of Arizona Sports & Spine. (Doc. 213-1 at 61-65.) On December 31, 2013, Jimenez signed Arizona Sports & Spine's Physician's Lien, which granted Arizona Sports & Spine a lien "for medical and other services," directed Jimenez's attorney to pay directly to Arizona Sports & Spine the sums "owing for medical services rendered," and indicated that Jimenez understood that he was "fully responsible to Arizona Sports & Spine[] for all medical bills." (Doc. 220-1 at 5.)

On November 28, 2017, Meisha Coulter, the billing manager for Arizona Sports & Spine, declared, under penalty of perjury, that Jimenez was treated by Dr. Charochak and another doctor between January 2, 2014 and March 24, 2014, and that the Arizona Sports-Coventry Agreement was applicable to all doctors who treated Jimenez. (Doc. 213-3 at 14, 15, 19.) Ms. Coulter also declared that "a payment of $2,2464.24 is payment in full" for all of Jimenez's treatment and services, and, significantly, that Arizona Sports & Spine would never seek payment from Jimenez or anyone else of "the difference between the amount originally billed ($5,360.00) and the accepted, repriced contract rate ($2,464.24)." (Doc. 213-3 at 19.) This declaration was submitted by Progressive's counsel. (Doc. 213-3 at 14-19.)

Jimenez, through his attorney, submitted an additional declaration by Meisha

---

[7] The registration form directs those who check "yes" to "go to page 2," but page 2 has not been provided to the Court. (Doc. 220-1 at 4.)

Coulter, under penalty of perjury, dated May 1, 2018. (Doc. 179-21.) In this declaration, and somewhat inconsistently, Ms. Coulter stated that while Arizona Sports & Spine would "comply with the agreement set forth in the previous declaration … to accept the Coventry rate as payment in full," Arizona Sports & Spine did not agree "that the Coventry amount is a reasonable rate." (Doc. 179-21 at 4.)

B.     *Medical Treatment, Billing, and Payments*

After the Accident, Jimenez retained John Aragon to represent him. (Doc. 213 at 9.) Aragon sent Progressive a letter, dated December 27, 2013, informing Progressive that Jimenez was seeking medical treatment related to the Accident and that he would collect all of Jimenez's medical bills and submit them to Progressive for payment. He instructed Progressive to send all payments for Jimenez's medical treatment directly to him. (Doc. 213 at 9.) Progressive acknowledged Aragon's representation on January 7, 2014 and requested all medical bills for the claim be sent to Progressive. (Doc. 213 at 9.)

On April 14, 2014, Aragon sent to Progressive a letter detailing Jimenez's total medical expenses of $6,719 ($785 to Arizona Injury Centers, $5,360 to Arizona Sports & Spine, $234 to SMI Imaging, and $340 to STI), and demanding payment of the Med Pay limits of $5,000. (Doc. 218 at 3-4.) At his deposition on July 26, 2017, Aragon confirmed that this demand included all bills for Jimenez's treatment presented to Progressive. (Doc. 173 at 4, Doc. 174-5 at 3-4, 8.)

Progressive reviewed the medical bills from the four medical providers submitted with the demand letter and determined that Arizona Injury Centers, STI, and Arizona Sports & Spine, pursuant to the contracts with Coventry and Three Rivers, had previously expressly agreed to accept reduced amounts as payment in full. Progressive sent $3,455.09 in total to Aragon:

| Provider | Amount Billed | Amount Paid by Progressive |
|---|---|---|
| SMI Imaging | $ 234.00 | $ 234.00 |
| Arizona Injury Centers | $ 785.00 | $ 555.00 |
| STI | $ 340.00 | $ 201.85 |
| Arizona Sports & Spine | $5,360.00 | $2,464.24 |
| **Total** | **$6,719.00** | **$3,455.09** |

(Doc. 218 at 4.)

Aragon responded on July 9, 2014, contesting the amount and demanding the $5,000 Med Pay policy limits. (Doc. 213 at 13.) On July 18, 2014, Progressive replied, stating that if one of the providers attempted to balance bill or dispute the amount of payment, Progressive would address it directly with the provider. (Doc. 213 at 13.) Progressive requested that Aragon inform Progressive of any such dispute, specifically the amount in dispute and the reason for the dispute, so that Progressive could "take it up with the provider." (Doc. 213 at 13.)

Prior to March 2018, Jimenez made no payments to his medical providers, and Aragon never forwarded the payments Progressive had sent to him, instead keeping the $3,455.09 check in his possession. (Doc. 213 at 13; Doc. 174-5 at 6;[8] Doc. 174-10 at 1-2.) On May 20, 2017, Jimenez responded to several interrogatories regarding payments for medical services by stating "Plaintiff's health care providers are waiting [sic] the conclusion of this case to be paid their bills for treatment." (Doc. 174-10 at 4.)

On March 5, 2018, at a Rule 16 conference, the Court ordered the parties to confer regarding whether "Plaintiff paid anything to the medical providers or whether the medical providers expect[ed] any additional payment from Plaintiff such that Plaintiff has been damaged and has standing to bring this suit." (Doc. 171.) Perhaps in response, on March 23, 2018, Jimenez delivered two cashier's checks, to Arizona Injury Centers in the amount

---

[8] At his deposition on July 26, 2017, Aragon testified repeatedly about the status of the bills from STI, stating that he had not paid STI the $201.85 that Progressive sent and that STI had not sought payment other than the $340. (Doc. 174-5 at 6-7.)

- 9 -

of $785, and to STI in the amount of $2,130. (Doc. 173 at 8, Doc. 174-13 at 34-36, 38-40.) The parties do not dispute that these funds came from Jimenez personally, while the $3,455.09 sent by Progressive to Aragon for Jimenez's medical expenses still remains in Aragon's custody.

On April 19, 2018, Progressive filed a motion for sanctions based on the payments and the submission, well after the close of discovery, of Dr. Kujawski's second declaration (which directly contradicted his prior sworn declaration). (Doc. 173.) Plaintiff responded and filed a cross-motion for sanctions. (Doc. 178.) On July 10, 2018, the Court dismissed Jimenez's claims for lack of standing, and denied all pending motions as moot. (Doc. 199.) Jimenez appealed, and the Ninth Circuit declined to address the merits but reversed and remanded. These summary judgment motions followed.

It is undisputed that as of now, over six years after Jimenez's treatments, Jimenez's medical providers have not initiated any collection activity against Jimenez, nor has Jimenez received any bills for the disputed amounts or been contacted by his medical providers for those expenses. (Doc. 213 at 13.)

## LEGAL STANDARD

The moving party is entitled to summary judgment if the evidence, viewed in the light most favorable to the non-moving party, shows "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004); *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). At summary judgment, the court cannot weigh the evidence nor make credibility determinations. *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005). The moving party initially bears the burden of proving the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986). To do so, "[t]he moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies,*

*Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the non-moving party to demonstrate the existence of a factual dispute that might affect the outcome of the suit. *Saddiq v. Trinity Servs. Grp.*, 198 F. Supp. 3d 1051, 1055 (D. Ariz. 2016).

Regarding the evidence, the district court "need consider only the cited materials." Fed. R. Civ. P 56(c)(3). Thus, "where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found" "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact." *Wyatt Tech. Corp. v. Smithson*, 345 F. App'x 236, 239 (9th Cir. 2009) (quoting *Carmen v. San Fran. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)). That said, the district court may consider materials in the record not cited by the parties. Fed. R. Civ. P 56(c)(3).

**ANALYSIS**

**I.     PROGRESSIVE'S MOTION FOR SUMMARY JUDGMENT**

*A. Jimenez's Compliance with the Condition Precedent*

Progressive argues its contract with Jimenez required Jimenez to meet certain conditions, including paying the full amount of the disputed medical bills, before he could sue, and because he did not meet those conditions he was not entitled to bring this suit. This contract provision, versions of which often appear in insurance contracts under the heading "legal action against us," sets forth the conditions which must be met before a plaintiff can bring suit. *Keller v. Fed. Ins. Co.*, 765 F. App'x 271, 272 (9th Cir. 2019). The "legal action against us" provision in Jimenez's Policy requires "full compliance with all the terms of this policy," Doc. 213-1 at 37, including what follows.

> The **insured person** may not sue **us** for expenses for **medical services we** deem to be unreasonable or unnecessary unless the **insured person** paid the entire disputed amount to the medical service provider or the medical service provider has initiated collection activity against the **insured person** for the unreasonable or unnecessary expenses.

(Doc. 213-1 at 17.)

Progressive argues that neither condition has been met. First, Jimenez made no payments to medical services providers until March 23, 2018, nearly three years after filing the complaint and after the close of discovery, and even then for less ($2,915) than either

the Med Pay limit of $5,000 or the total bills submitted of $6,719. (Doc. 212 at 8.) Second, Jimenez's medical providers have not initiated any collection activity against him, nor has he received any bills or been contacted by them for those additional expenses. (Doc. 213 at 13.)

Jimenez responds that the provision is to be interpreted to mean "the unreasonableness or lack of necessity of *medical services*—and not the unreasonableness or lack of necessity of the medical expenses that Jimenez had incurred." (Doc. 219 at 5.) In other words, Jimenez claims he would only be precluded from filing a lawsuit if Progressive had actually disputed whether the medical services were reasonable and necessary. And because Progressive did not do so, the filing of the lawsuit did not violate the provision. (Doc. 219 at 4-7.)

When interpreting an insurance contract under Arizona law, the Court looks first to the policy language, and construes the provisions according to their plain and ordinary meaning. *Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 546 (Ariz. Ct. App. 2007); *Aetna Cas. & Sur. Co. v. Dannenfeldt*, 778 F. Supp. 484, 491 (D. Ariz. 1991). Here, the condition precedent appears in a provision titled "Unreasonable or Unnecessary Medical Expenses." (Doc. 213-1 at 17.)

Jimenez argues that, under the last antecedent rule, the phrase "unreasonable or unnecessary" refers to "medical services" and not "expenses." (Doc. 219 at 6.) That is incorrect and contrary to law, as well as common sense. The last antecedent rule, in Arizona, requires "that a qualifying phrase be applied to the word or phrase immediately preceding as long as there is no contrary intent indicated." *Phoenix Control Sys., Inc. v. Ins. Co. of N. Am.*, 796 P.2d 463, 466 (Ariz. 1990). However, "'[a]n insurance policy is not to be interpreted in a factual vacuum,'" and the last antecedent rule should "not be applied where the context or clear meaning of a word or phrase requires otherwise." *Id.* (quoting 13 Appleman, Insurance Law and Practice § 7383 at 8 (1989 Supp.)).

Here, the context clearly requires the Court to apply "unreasonable or unnecessary" to "expenses" and not to "medical services." The initial "Insuring Agreement" provisions

of the Med Pay section note that "reasonable" refers to "expenses for medical services" and "necessary" refers to "the medical services." (Doc. 213-1 at 14.)[9] Furthermore, in the three paragraphs which constitute the "Unreasonable or Unnecessary Medical Expenses" provision the phrase "unreasonable or unnecessary" appears three times as part of the larger phrase "expenses for medical services that we deem to be unreasonable or unnecessary" and once as "the unreasonable or unnecessary expenses." (Doc. 213-1 at 17) (emphasis omitted). The plain and ordinary meaning of this provision is that the word being modified by "unreasonable or unnecessary" is "expenses"—specifically, "expenses for medical services," which are distinguishable from other "reasonable expenses, [such as] loss of earnings." (Doc. 213-1 at 17.)

To interpret the "Unreasonable or Unnecessary Medical Expenses" provision as governing unreasonable or unnecessary medical *services* would be to rewrite the contract and "'add something to the contract which the parties have not put there.'" *Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 183 P.3d 513, 518 (Ariz. 2008) (quoting *D.M.A.F.B. Fed. Credit Union v. Employers Mut. Liab. Ins. Co.*, 396 P.2d 20, 23 (1964)). The Court will not do so.

Accordingly, Jimenez has failed to satisfy the condition precedent in the Policy of either paying the entire disputed amount or being subject to collection activity before filing this action. This failure was not cured by his late payments after the Court brought a similar issue to his attention, nor can any future payments cure it. Progressive's motion for summary judgment is granted on all counts. The Court will nonetheless address the merits of Jimenez's claims, which also fail.

*B. Breach of Contract*

For a plaintiff to prevail on a breach of contract claim, the plaintiff must prove "the existence of the contract, its breach and the resulting damages." *Thomas v. Montelucia*

---

[9] "**We**, or someone on **our** behalf, will determine:
   1. whether the expenses for **medical services** are reasonable; and
   2. whether the **medical services** are necessary."
(Doc. 213-1 at 14.)

*Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013) (quoting *Graham v. Asbury*, 540 P.2d 656, 657 (1975)). The parties do not dispute the existence of a contract requiring Progressive to pay "reasonable expenses **incurred** for necessary medical services," nor do the parties dispute that the medical services Jimenez received were necessary. (Doc. 213-1 at 14) (emphasis added). But the parties disagree on whether the contract has been breached with resulting damages.

At the core of this dispute is a math problem for Jimenez. He submitted to Progressive medical bills totaling $6,719; his policy limit was $5,000; and Progressive sent $3,455.09 to his counsel, the sum which the healthcare providers had, pursuant to the terms of their own contracts with Progressive, agreed to accept as payment in full. But Jimenez argues he "incurred" $6,719 in expenses, for which he was liable though he had not paid a penny of this amount until March 23, 2018.[10] Under Jimenez's theory, Progressive owes Jimenez $5,000, which Jimenez may use however he wishes ("to pay medical bills, repair his vehicle, put it in savings, pay his electric bill, or go on a trip," Doc. 210 at 7), while Jimenez independently owes his doctors $6,719 (or an additional $1,719 beyond the policy limits). But Progressive claims because the healthcare providers expressly agreed to accept $3,455.09 as payment in full, Jimenez "incurred" only $3,455.09 in expenses.

This District has noted the "unique payment practices of the health care industry," wherein "health care providers routinely accept an amount less than the amount billed as payment in full." *Pierce v. Cent. United Life Ins. Co.*, No. 07-1023-PHX-EHC, 2009 WL 2132690, at *5 (D. Ariz. July 15, 2009). The *Pierce* court, focused on the meaning of the phrase "actual charges," noted that "[t]he patient is responsible for the amount billed, whether insured or not," and concluded that "the phrase 'actual charges' is reasonably defined as the amount billed by the health care provider, before any insurance adjustments

---

[10] Jimenez argues that he is liable for the full amount billed because of liens he signed with his healthcare providers. But he has provided only evidence of liens to Arizona Injury Centers and Arizona Sports and Spine; at STI, Jimenez checked the box indicating "a party other than [him]self … [wa]s responsible for the payment of these visits." (Doc. 220-1 at 1-5.)

- 14 -

that may reduce the amount that the health care provider accepts as payment in full." *Id.* at *7, *9. Similarly, the Arizona Supreme Court considered the rule to apply "when the insured is immunized from legal liability by a statute that transfers liability for covered expenses to the collateral source of payment," and concluded the phrase "actually incurred by the insured" means "actually incurred for treatment of the insured rather than actually incurred for treatment for which the insured is directly legally liable." *Samsel v. Allstate Ins. Co.*, 59 P.3d 281, 286, 291 (Ariz. 2002).

The Ninth Circuit declined to address the merits of this case, and did not clarify whether the "reasonable expenses incurred" were those billed ($6,719) or those accepted as payment in full ($3,455.09). (Doc. 205-1.) Significantly, the Ninth Circuit noted that Jimenez would have standing if the "reasonable expenses incurred" were those billed. (Doc. 205-1 at 3-4.)

*Samsel* and *Pierce* considered simply what charges were "incurred." Neither case addressed the proper interpretation of the word "reasonable" when applied to such charges. Thus, even if the Court were to agree with Jimenez that he had "incurred" the full amount reflected in the original charges, it is clear that Progressive never agreed to pay such charges. Unlike the insurance company in *Pierce* that had contracted to pay the "actual charges," Progressive only agreed to "pay the **reasonable** expenses incurred for necessary medical services." (Doc. 213-1 at 14) (emphasis added). Arizona contract law requires that every part of the agreement must be given effect.[11] *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 973 (Ariz. Ct. App. 2010); *Haeger v. Goodyear Tire & Rubber Co.*, No. CV-05-02046-PHX-GMS, 2018 WL 3872194, at *3 (D. Ariz. Aug. 15, 2018) ("Arizona law gives effect to every word in a contract and interprets contracts in such a way to give meaning to all of its terms."). And Jimenez has not pointed to any Arizona caselaw requiring an insurance company to accept the originally billed amounts as "reasonable," regardless of their amount. The illogic of Jimenez's argument is that if Jimenez's providers had billed

---

[11] *But see Banner Health v. Med. Sav. Ins. Co.*, 163 P.3d 1096, 1101–02 (Ariz. Ct. App. 2007) ("[T]he fact that hospitals routinely accept reduced payments on behalf of many patients [does not] mean that the published and billed rates are unreasonable.").

- 15 -

him $1 billion for his medical services, presumably Jimenez would not claim that $1 billion should be deemed a **reasonable** expense simply because he received a $1 billion bill.

The caselaw on whether expenses incurred in the medical context are those billed or those accepted as payment in full varies significantly across the country, with many courts holding, as *Samsel* does, that a patient is liable for the expenses billed. A few courts have addressed the question of whether, in the medical expenses context, "**reasonable**" expenses are those billed or those accepted as payment in full, and the Court finds persuasive those that have interpreted reasonable expenses as those expenses accepted as payment in full. *See West v. Shelby Cty. Healthcare Corp.*, 459 S.W.3d 33, 44-46 (Tenn. 2014) (In Tennessee, "with regard to an insurance company's customers, 'reasonable charges' are the charges agreed to by the insurance company and the hospital"—in other words, the amount accepted as payment in full. Using the amount billed is unreasonable because "virtually no public or private insurer actually pays full charges," and a "more realistic standard," which "reflect[s] what is [actually] being paid in the market place," is "what insurers actually pay and what the hospitals [are] willing to accept"—i.e. the amount accepted as payment in full.); *Allstate Ins. Co. v. Holy Cross Hosp., Inc.*, 961 So. 2d 328, 335 (Fla. 2007) (If a healthcare provider "has agreed in a valid and enforceable contract to accept payment for services at a particular rate, that rate would necessarily be a 'reasonable amount for the services ... rendered.'") (quoting *Nationwide Mut. Ins. Co. v. Jewell*, 862 So. 2d 79, 86 (Fla. Dist. Ct. App. 2003)); *see also Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130, 1142 (Cal. 2011) ("We do not suggest hospital bills always exceed the reasonable value of the services provided … If we seek … the exchange value of medical services the injured plaintiff has been required to obtain, looking to the negotiated prices providers accept from insurers makes at least as much sense, and arguably more, than relying on [the amount billed]…. For this reason as well, it is not possible to say generally that providers' full bills represent the real value of their services…") (citation omitted); *Kenney v. Liston*, 760 S.E.2d 434, 451 (W. Va. 2014) (Loughry, J., dissenting) ("Given the current complexities of health care pricing structures, it is simply absurd to conclude that

the amount billed for a certain procedure reflects the 'reasonable value' of that medical service. … '[b]ecause so many patients, insured, uninsured, and recipients under government health care programs, pay discounted rates, hospital bills have been called "insincere," in the sense that they would yield truly enormous profits if those prices were actually paid.") (quoting *Howell*, 257 P.3d at 1142); *but see Bynum v. Magno*, 101 P.3d 1149, 1162 (Haw. 2004), as amended (Dec. 2, 2004) (in the collateral source context, the "standard rate[]," i.e. the amount billed, is "relevant and should be admissible for establishing the reasonable value of medical costs constituting such special damages").

Accordingly, the Court holds the "reasonable expenses incurred for necessary medical services" are those expenses which the healthcare provider accepts as payment in full. Progressive did not breach the parties' contract by paying the amount the healthcare providers agreed to accept as payment in full.

### C. Bad Faith

Under Arizona law, the tort of bad faith arises when an insurer "intentionally denies, fails to process or pay a claim without a reasonable basis." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000). To establish bad faith, Jimenez must show both "the absence of a reasonable basis for denying benefits of the policy" (the objective prong) and Progressive's "knowledge or reckless disregard of the lack of a reasonable basis for denying the claim" (the subjective prong). *Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1267–68 (Ariz. 1992); *Milhone v. Allstate Ins. Co.*, 289 F. Supp. 2d 1089, 1094 (D. Ariz. 2003) ("The second prong is a subjective test, requiring the plaintiff to show that the defendant insurance company committed consciously unreasonable conduct.").

Because "some form of consciously unreasonable conduct is required," *Echanove v. Allstate Ins. Co.*, 752 F. Supp. 2d 1105, 1109 (D. Ariz. 2010), and it was reasonable for Progressive to promptly send full payments of the amount the healthcare providers were contractually obligated to accept, the bad faith claim fails.

### D. Consumer Fraud

To establish a private cause of action under the Arizona Consumer Fraud Act,

A.R.S. §§ 44-1521 *et seq.*, Jimenez must prove by a preponderance of the evidence that Progressive made "a false promise or misrepresentation" in connection with the sale of the Policy, and that he suffered a consequent and proximate injury when he "relie[d] on the misrepresentation even though the reliance is not reasonable." *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992). The parties do not dispute that no one explained Med Pay coverage to Jimenez prior to him purchasing the Policy, Doc. 218 at 2, or that Jimenez never viewed Progressive's website, or any websites, to learn about Med Pay coverage prior to purchasing his Policy, nor did Jimenez rely on any advertisements about Med Pay prior to purchasing his Policy. (Doc. 213 at 2.)

Jimenez argues that Progressive's representation that it would pay "reasonable expenses incurred for necessary medical services" was a misrepresentation, as was Progressive's "effort to create the VPN scheme." (Doc. 219 at 12.) But those were not false, nor were they misrepresentations, and there is no genuine dispute of material fact even viewing the facts in the light most favorable to Jimenez as the non-moving party.

Jimenez cannot prove that he relied on any false promise or misrepresentation by Progressive and Progressive is entitled to summary judgment as a matter of law on Jimenez's consumer fraud claim.

*E. Declaratory Relief*

Progressive argued that "[b]ecause Jimenez's breach of contract and bad faith claims fail as a matter of law, this Court should also grant summary judgment to Progressive on Jimenez's declaratory relief claim." (Doc. 212 at 17.) Jimenez did not respond to this argument, and his declaratory relief claim also fails.

**II.   JIMENEZ'S MOTION FOR SUMMARY JUDGMENT**

Jimenez moves for summary judgment on the issue of Progressive's use of third-party VPN contracts to reduce medical payments, on the grounds that he has unknowingly become bound by the VPN contracts. (Doc. 210.) He argues that because he is not a party to the VPN contracts he has no privity in those contracts, and therefore cannot be bound by the reduced rates in the VPN contracts. This argument mistakes the purpose and function

of the VPN contracts, which the Court previously addressed.

The Court construes Jimenez's motion for summary judgment on the "issue of Defendant Progressive's use of third-party Value Provider Network … contracts to reduce medical payments … coverage after the reasonable amount has been determined" to be a motion for partial summary judgment on his breach of contract claim. The Court granted summary judgment in favor of Progressive on all claims, including the breach of contract claim. Accordingly, Jimenez's Motion for Summary Judgment re: Use of Third-Party VPN Contracts by Progressive is denied.

### III. PROGRESSIVE'S MOTION FOR SANCTIONS

In April 2018, Progressive moved for case-terminating sanctions, for the Court to disregard the late-disclosed evidence, and for monetary sanctions against Aragon. (Doc. 173.) The case will terminate with the grant of summary judgment and Progressive is not entitled to monetary sanctions on the grounds argued. Progressive's motion for sanctions is denied.

### IV. JIMENEZ'S CROSS-MOTION FOR SANCTIONS

In May 2018, Jimenez responded to Progressive's motion for sanctions with a cross-motion to sanction Progressive for failing to respond adequately to discovery requests seeking the disclosure of all correspondence between Progressive and Jimenez's healthcare providers. (Doc. 178.) Jimenez requested sanctions in the amount of attorneys' fees and costs. (Doc. 178 at 31.) Jimenez provided no evidence that Progressive failed to comply with its discovery obligations. Jimenez's cross-motion for sanctions is denied.

Accordingly,

**IT IS ORDERED** Progressive's Motion for Summary Judgment (Doc. 212) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of Defendant and against Plaintiff.

**IT IS FURTHER ORDERED** Jimenez's Motion for Summary Judgment Regarding Use of Third-Party VPN Contracts by Progressive (Doc. 210) is **DENIED**.

**IT IS FURTHER ORDERED** Progressive's Motion for Sanctions (Doc. 173) is

1 **DENIED**.

2 **IT IS FURTHER ORDERED** Jimenez's Cross Motion for Sanctions (Doc. 178)

3 is **DENIED**.

4 Dated this 28th day of April, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge